IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 16, 2010

Lyle W. Cayce
Clerk

No. 08-61129

RAIMEE MARMILLION,

Plaintiff - Appellant

v.

AMERICAN INTERNATIONAL INSURANCE COMPANY; AIG
MARKETING INC; WILLIS NORTH AMERICA INC; WILLIS OF
LOUISIANA INC,

Defendants - Appellees

Consolidated with
No. 09-60228

RAIMEE MARMILLION,

Plaintiff - Appellee

v.

WILLIS NORTH AMERICA INC; WILLIS OF LOUISIANA INC;
AMERICAN INTERNATIONAL INSURANCE COMPANY; AIG
MARKETING INC,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi
No. 1:07-cv-1132

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Raimee Marmillion, a victim of Hurricane Katrina, filed suit against American International Insurance Company ("AIG"), AIG Marketing, Inc., Willis North America Inc., and Willis of Louisiana, Inc. ("Willis") after AIG allegedly refused to honor the insurance policy on her damaged beach house. Although the case proceeded to trial, the district court granted the defendants' motions for judgment as a matter of law. The defendants, as the prevailing parties, moved for costs. The district court denied their costs in substantial part. The parties' appeals are before the court.

I.

Willis procured four insurance policies through AIG for Marmillion in October 2003. The policies included two homeowner's insurance policies—one for Marmillion's beach house in Mississippi and one for Marmillion's house in Metairie, Louisiana; an excess liability policy; and an automobile policy. The premium for all four policies was billed under a single account and payable in four installments. AIG agreed to directly bill Marmillion for each premium payment.

In late 2003 and continuing into 2004, Marmillion contacted Willis several times about changing her billing address. Marmillion's living situation changed frequently during that time. Despite Marmillion's requests, her billing address never changed before AIG sent the bill for the next premium installment. She regularly failed to receive billing statements from AIG and regularly failed to make timely premium payments. AIG issued Marmillion at least eight notices of cancellation and, on at least one occasion, temporarily cancelled her policies.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Despite these problems, Marmillion was able to arrange with Willis and AIG to pay an amount to keep all four polices in force.

The policies renewed in October 2004, and Marmillion continued to experience billing problems. For instance, Marmillion did not receive a bill in September or November 2004. Both times, AIG sent Marmillion a notice of cancellation. Upon receipt of the notice, Marmillion contacted Willis and asked that it send her the bill so she could avoid cancellation. Willis faxed the bills and the premiums were paid before the policies cancelled.

Because AIG continued to send the bills to the wrong address, Marmillion again contacted Willis in November 2004 and asked that her billing address be changed to her home in Arkansas. She also asked Willis to cancel her automobile policy. A Willis employee sent AIG an e-mail in November 2004 asking AIG to change Marmillion's "insured address" to the Arkansas address and to cancel her automobile policy. An AIG employee interpreted the e-mail as a request to change the mailing address, not a request to change the mailing and billing addresses. AIG changed her mailing address and cancelled the automobile policy, but her billing address remained the same. In mid-January 2005, Marmillion again requested that her billing address be changed.

AIG sent Marmillion her third bill for the 2004–2005 policy year on January 21, 2005. However, because the bill was not sent to her Arkansas address, Marmillion did not receive it. AIG sent a reminder notice, but again, not to the Arkansas address. Having not received the bill or the reminder notice, Marmillion did not pay her bill.

On March 21, 2005, AIG mailed cancellation notices to Marmillion at the Arkansas address for the beach house policy and the Metairie policy for non-payment of premium. The notices stated the amounts due and when the policies would be cancelled. Marmillion received the notices of cancellation before the policies were cancelled, but did not ask Willis to send her the third bill or pay the

amount owed. At the time of cancellation, both policies had accrued excess premiums. The premium credits were refunded to Marmillion on May 4, 2005, but the check was sent to the wrong address.

In June, Marmillion contacted Willis about her account. A Willis employee informed her that the policies had been cancelled, and Marmillion told the employee that she did not believe her. According to Marmillion's testimony, the employee told Marmillion that she would contact AIG and that Marmillion did not need to make a payment and that she had a credit coming.

In August 2005, Marmillion contacted Willis's corporate office in New York and spoke to Sandra Bravo. According to Marmillion, Bravo informed Marmillion that she was going to help Marmillion "take care of this" and asked Marmillion to tell her exactly what Marmillion needed covered. That day, Marmillion wrote a check to AIG for $7,576.80 but did not send it.

In a letter dated August 18, 2005, a Willis employee informed Marmillion that the beach house policy had been cancelled effective April 6, 2005, and that Willis would make no attempt to have the policy reinstated or replaced absent receipt of a written request from Marmillion. Marmillion never contacted Willis to seek reinstatement or replacement of her policy.

Hurricane Katrina struck on August 29, 2005, and damaged the beach house. On September 15, 2005, Marmillion overnighted the check drafted in August, and Willis assisted Marmillion in filing her claim on the beach house policy. Her claim was later denied by AIG on the basis that AIG cancelled her policy before the claim arose.

After AIG denied her claim, Marmillion filed suit. The case proceeded to trial. But, at the close of Marmillion's case in chief, the district court granted AIG's motion for judgment as a matter of law on one of Marmillion's theories of breach of contract and dismissed AIG Marketing, Inc. The district court also granted Willis's motion for judgment as a matter of law on one of Marmillion's

theories of negligence and dismissed Willis North America, Inc. At the close of the case, the district court granted judgment as a matter of law on Marmillion's remaining claims.

As the prevailing parties, the defendants filed bills of costs. Marmillion objected, and the district court substantially denied the requested costs. This appeal ensued.

We will consider first whether judgment as a matter of law was properly granted on Marmillion's breach of contract and negligence claims. We will then consider whether the district court abused its discretion in substantially denying the defendants' costs.

II.

We review de novo whether a district court properly granted judgment as a matter of law, applying the same legal standard as the district courts. Brown v. Bryan County, OK, 219 F.3d 450, 456 (5th Cir. 2000). "If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on the issue," a district court may resolve an issue against the party and grant a motion for judgment as a matter of law on a claim or defense. FED. R. CIV. P. 50(a). "In evaluating such a motion, the court must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury." U.S. Commodity Futures Trading Comm'n v. Dizona, 594 F.3d 408, 413 (5th Cir. 2010) (citation omitted).

On appeal, Marmillion argues that the district court erred in granting the defendants' motions for judgment as a matter of law because she produced legally sufficient evidence that would allow a reasonable jury to find in her favor

on her breach of contract and negligence claims. Under the above standard, we will review the sufficiency of the evidence produced.

A.

Marmillion asserts that AIG breached the insurance agreement by wrongfully cancelling the beach house policy for failure to render the third premium payment. According to Marmillion, no payment was due because her premium credit exceeded the amount owed and AIG had a duty to apply the credit to her outstanding balance. The question on appeal is whether Marmillion produced legally sufficient evidence demonstrating that before the beach house policy cancelled, Marmillion had a premium credit that exceeded the amount owed on the policy.

Marmillion argues that a reasonably prudent jury could find that Marmillion had a premium credit of $856.80 and that the third premium payment was $344.80. To support her argument that she had a premium credit of $856.80, Marmillion relies on two stipulations. The first stipulation stated that a premium credit of $439.60 resulted from the cancellation of the Metairie policy. The Metairie policy cancelled on April 1, 2005. The second stipulation stated that a credit of $417.20 resulted from the cancellation of the beach house policy. The beach house policy cancelled on April 6, 2005. Considering this evidence in the light most favorable to Marmillion, on April 6, 2005, before the beach house policy cancelled, Marmillion had a premium credit of $439.60. She did not have a credit of $856.80 until the beach house policy cancelled.

We must now ask whether Marmillion produced sufficient evidence demonstrating that she owed less than $439.61 on the beach house policy. Marmillion claims that she owed $344.80. To support this position, she relies on three documents—the notices of cancellation for the Metairie and beach house policies and the January 21, 2005 bill. These documents show that on January 21, 2005, Marmillion owed a minimum of $1,470.80 for the four policies on the

account (the automobile policy, the personal excess liability policy, and the two homeowners policies). Specifically, she owed $248.80 on the personal excess liability policy, $724.40 on the beach house policy, and $497.60 on the Metairie policy. The installment schedule listed $344.80 as the amount due for the third installment, the amount paid as "-$1,126.00," and an outstanding balance of $1,470.80. The current amount due for all policies on the account was $1,470.80. On March 21, 2005, AIG sent Marmillion notice that it planned to cancel the Metairie policy for non-payment of premium on April 1, 2005, and the beach house policy on April 6, 2005. At that time, Marmillion owed $378.80 on the Metairie policy and $724.40 on the beach house policy.

Marmillion argues that a genuine issue of material fact exists as to the amount she owed on the beach house policy because the January 21, 2005 bill stated that the amount due for the third installment was $344.80 but also stated that $1,470.80 was the current amount due for all policies and that she specifically owed $724.40 on the beach house policy. At trial, Marmillion offered no explanation or evidence as to why she owed $344.80 on the beach house policy, as opposed to $724.40. Absent testimony or additional evidence explaining why $344.80 was the amount owed or the reason for the apparent discrepancy, the document, standing alone, would not provide a jury a legally sufficient evidentiary basis to find that Marmillion owed less than $439.61 on the beach house policy. See Coats v. Pierre, 890 F.2d 728, 732 n.1 (5th Cir. 1989). Under Mississippi law, the plaintiff has the burden of proving the right to recover for the breach of an insurance agreement. See Broussard v. State Farm Fire & Cas. Co., 523 F.3d 618, 625 (5th Cir. 2008) (citation omitted). "[T]his basic burden never shifts from the plaintiff." Id. The district court did not err in granting AIG judgment as a matter of law on this theory of breach of contract.

B.

Marmillion also argues that AIG breached the insurance agreement by failing to send billing statements to Marmillion's proper address. AIG moved for judgment on this theory arguing that even if it breached the agreement by failing to mail the billing statements to the correct address, the breach was not material and did not excuse Marmillion's duty to pay the premium. The district court agreed and held that any breach by AIG was not material. The issue on appeal is whether AIG materially breached the insurance agreement.

Under Mississippi law, "[a] breach is material if (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, (2) the breach substantially defeats the contract's purpose, or (3) the breach is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract." Lauderdale County Sch. Dist. v. Enter. Consol. Sch. Dist., 24 F.3d 671, 686 (5th Cir. 1994) (citing UHS-Qualicare v. Gulf Coast Cmty. Hosp., 525 So. 2d 746, 756 (Miss. 1987)). Ordinarily, materiality is a question of fact for the jury to decide. Hensley v. E.R. Carpenter Co., Inc., 633 F.2d 1106, 1110 (5th Cir. 1980); Sanford v. Federated Guar. Ins. Co., 522 So. 2d 214, 217 (Miss. 1988).

On appeal, Marmillion argues that questions of fact exist, but she fails to identify how those facts support a finding of material breach. She does not argue or attempt to show that AIG's duty to send bills to the correct address was a substantial part of the agreement or an essential term or condition. Nor does she argue that the breach substantially defeated the contract's purpose or that mailing the bills to the correct address was vital to the existence of the contract. But, even if argued, the evidence presented at trial fails to support such conclusions.

Before the policy cancelled, AIG notified Marmillion that she owed $724.40 on the beach house policy and that the policy would be cancelled for non-

payment. She received with either that notice of cancellation, or with a previous notice, instructions advising her as to how to avoid cancellation. She admitted receipt of the notice and instruction sheet at trial. Both the notice of cancellation and the January 21, 2005 bill stated that Marmillion owed $724.40 on the beach house policy. Marmillion knew the amount owed, what to do to cure the delinquency, and the consequences of failing to do so. Marmillion failed to present legally sufficient evidence demonstrating that receiving the bill at the correct address (the Arkansas address) was an essential term of the agreement.

During the policy period at issue, AIG never fulfilled its obligation to bill Marmillion at the correct address. Despite this failure, Marmillion paid the first and second premium, after she received the notice of cancellation. AIG received its payment and Marmillion's coverage continued. The failure to bill Marmillion at the correct address did not substantially defeat the contract's purpose.

Finally, the insurance agreement cannot be reasonably construed to show that the parties considered sending the bills to the correct address vital to the existence of the agreement. For these reasons, we affirm the district court's judgment as a matter of law on Marmillion's breach of contract claims.[1]

C.

At trial, Marmillion argued that Willis was negligent for two independent reasons. Her first theory of negligence was predicated on Willis's failure to act on her requests to ensure that AIG corrected her billing address. At the close of Marmillion's case, the district court granted Willis judgment as a matter of law on this theory of negligence, reasoning that if AIG's failure to bill Marmillion at the correct address was not a material breach, then the failure of Willis to

---

[1] Because Marmillion failed to produce legally sufficient evidence on her breach of contract claims, we need not consider whether the district court erred in granting AIG's motion for judgment as a matter of law on the alternative ground of acquiescence or erred in granting AIG's motion for summary judgment on Marmillion's bad faith claim.

ensure that AIG had the proper billing address could not have caused Marmillion harm.

Marmillion's only argument on appeal is that if AIG's breach was material, the court should also reverse the district court's judgment as a matter of law in favor of Willis. Because Marmillion failed to produce sufficient evidence of materiality, we affirm the district court's judgment on this issue.

D.

Marmillion's second theory of negligence is predicated on Willis's alleged failure to reinstate or replace the beach house policy. After the close of the evidence, the district court granted Willis judgment as a matter of law finding that Marmillion failed to prove breach and causation. On review, "we may affirm the district court's decision on any ground supported by the record." Phillips ex rel. Phillips v. Monroe County, Miss., 311 F.3d 369, 376 (5th Cir. 2002).

To prevail on this theory of negligence, Marmillion must establish that Willis had a duty to reinstate or replace the beach house policy, Willis breached that duty, and the breach proximately caused her damages. See Lovett v. Bradford, 676 So. 2d 893, 896 (Miss. 1996). Mississippi law recognizes an insurance broker's "duty to his principal to procure insurance policies with reasonable diligence and good faith." Id.; see also First United Bank of Poplarville v. Reid, 612 So. 2d 1131, 1137 (Miss. 1992) (holding that an insurance broker "has a duty to use that degree of diligence and care with regard to securing insurance which a reasonably prudent person would exercise in the transaction of that person's own business of a like nature"). A broker who has agreed to procure insurance will be liable for any damages that result from the broker's failure to procure the requested insurance. Pittman v. Home Indem. Co., 411 So. 2d 87, 89 (Miss. 1982). The question before the court is whether

Marmillion produced sufficient evidence that Willis agreed to reinstate or replace the beach house policy. We hold that she did not.

Marmillion testified as follows. In June 2005, Marmillion contacted Willis on several occasions to discuss her AIG account. Cathy Guilfo, a Willis employee in the local office, informed Marmillion that her policies had been cancelled and that she had no insurance coverage. Guilfo then told Marmillion that she did not need to make a payment and that she had a credit on her account. Marmillion told Guilfo that she did not believe the polices had been cancelled. Guilfo told Marmillion she would contact AIG, but the record is void as to why Guilfo was going to contact AIG.

On August 15, 2005, after Guilfo failed to return Marmillion's telephone calls, Marmillion contacted Sandra Bravo, a Willis corporate executive in New York. She contacted Bravo because she wanted to find out the status of her policies. Marmillion understood that Bravo did not handle customer calls but would try to help. Marmillion described to Bravo the poor service she received from Willis. Specifically, she told Bravo about her attempts to get someone to change her address, send her invoices, help her understand where her payments were allocated, and let her know that her billing address had been corrected. She also told Bravo that there were some policies she might want to cancel. Because of her problems with Willis, Marmillion told Bravo that she had gotten insurance quotes and had discussed transferring her policies to another insurance broker. Marmillion further testified that Bravo told her that Willis did not want to lose her business, she did not have to obtain another policy, and that Bravo would "assist [her] in making sure everything was covered and everything was taken care of." According to Marmillion, Bravo asked Marmillion what she needed to make sure Marmillion had coverage on after they got off the phone. Marmillion listed the policies she believed she was currently

paying for, including the beach house policy. Bravo told Marmillion that she would take care of it and that someone would get in touch with her.

Sandi Davis, another Willis employee, sent Marmillion a letter dated three days later explaining that the automobile and excess liability polices were in full force and effect but that the beach house policy, the Metairie policy, and another automobile policy had been cancelled. The letter further stated that the cancelled policies would remain terminated and that Willis would make no attempt to replace the policies without an express written request. Marmillion did not contact Willis again until after the hurricane.

Even considering the evidence in the light most favorable to Marmillion, there is no evidence that Marmillion ever asked a Willis employee to reinstate or replace the beach house policy. When specifically asked by her attorney as to whether she wanted Willis to reinstate the policy, Marmillion evaded answering the question. There is no evidence that Sandra Bravo, or any other Willis employee, ever agreed to reinstate or replace the policy. Further, there is no evidence that Bravo knew that the policy needed to be reinstated or replaced during her conversation with Marmillion, and thus could not have agreed to reinstate or replace the policy. Although Marmillion testified that Bravo asked her "what do I need to do to make sure you have coverage on today when we hang up" and said she would take care of it, without any other evidence, these statements do not indicate that Bravo agreed to have the policy reinstated or replaced. There is insufficient evidence in the record for a reasonable jury to conclude that Willis agreed to reinstate or replace the beach house policy. Accordingly, we affirm the district court's judgment as a matter of law on this theory of negligence.[2]

---

[2] Because judgment as a matter of law was properly granted on each of Marmillion's claims, we need not consider whether the district court erred in finding that Marmillion could not recover her rebuilding costs.

III.

As the prevailing parties, AIG, AIG Marketing, Inc., Willis North America Inc., and Willis submitted bills of costs. Specifically, the AIG defendants sought $30,468.92 in costs for transcripts, service of summons and subpoenas, and copying. The Willis defendants sought $32,239.37 in costs for fees of the clerk, transcripts, witnesses, and copying. Marmillion objected, and the district court reduced the AIG defendants' recoverable costs to $415.40 and the Willis defendants' award to $1,920.04. The defendants appeal those deductions.

Generally, a prevailing party should be allowed costs. FED. R. CIV. P. 54(d)(1). The taxable costs include clerk fees; "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case; . . . [f]ees and disbursements for printing and witnesses; . . . [and] [f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case[.]" 28 U.S.C. § 1920; see Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441 (1987).

The district court is allotted broad discretion in taxing costs and may order each party to bear its own costs. Alberti v. Klevenhagen, 46 F.3d 1347, 1358 (5th Cir. 1995); Hall v. State Farm Fire & Cas. Co., 937 F.2d 210, 216 (5th Cir. 1991). There is, however, a strong presumption "that the prevailing party is prima facie entitled to costs and it is incumbent on the losing party to overcome that presumption since denial of costs is in the nature of a penalty." Walters v. Roadway Express, Inc., 557 F.2d 521, 526 (5th Cir. 1977) (citation and marks omitted). We review a district court's award of costs for an abuse of discretion and will reverse only upon a clear showing of an abuse of that discretion. Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1049 (5th Cir. 1998). "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." Nunez v. Allstate Ins. Co., 604 F.3d 840, 844 (5th Cir. 2010) (citation omitted); Hinojosa v. Butler, 547 F.3d

285, 292 (5th Cir. 2008) (citation omitted). Under the above standard, we review the district court's award of costs.

## A.

The defendants complain that the district court abused its discretion by failing to award costs for the eighteen depositions taken during discovery. Costs related to the taking of depositions are allowed under § 1920(2) and (4) "if the materials were necessarily obtained for use in the case." Stearns Airport Equip. Co., Inc. v. FMC Corp., 170 F.3d 518, 536 (5th Cir. 1999). "[A] deposition need not be introduced into evidence at trial in order to be 'necessarily obtained for use in the case.'" Fogleman v. ARAMCO, 920 F.2d 278, 285 (5th Cir. 1991). A deposition is necessarily obtained for use in the case "[i]f, at the time the deposition was taken, a deposition could reasonably be expected to be used for trial preparation, rather than merely for discovery." Id. A district court's factual determination of whether a deposition was necessarily obtained for use in the case is afforded great latitude. Id. at 285-86.

Before the district court, the AIG defendants argued that fourteen of the eighteen depositions taken during discovery were necessarily obtained for use in the case because Willis and Marmillion noticed the depositions and AIG obtained copies of those deposition transcripts to evaluate Marmillion's and Willis's trial strategies and to prepare its own defense. The AIG defendants further argued that because Marmillion designated twelve of the depositions in the pretrial order, the AIG defendants needed those deposition transcripts to review Marmillion's designated testimony for objections and counter-designations. The AIG defendants specifically argued that Olie Jolstad's deposition was necessary to AIG's case because AIG used it to support AIG's Daubert challenge and as a result, Marmillion stipulated that Jolstad would not provide testimony against AIG at trial. Jolstad was Marmillion's property damage expert.

14

Like the AIG defendants, the Willis defendants argued that twelve of the video deposition transcripts were necessarily obtained for use in the case because Marmillion designated each of the individuals as witnesses she would call to testify by deposition. They also argued that they had a reasonable expectation that four other deposition transcripts might be used at trial because Marmillion and AIG identified those individuals as possible live witnesses at trial. They concluded their argument by stating that they had a reasonable expectation that the depositions of each of the witnesses listed in their bill of costs would be used at trial as well as for trial preparation.

The district court denied the defendants all of their depositions costs finding that the defendants failed to demonstrate that the transcripts and videos of each of the eighteen depositions taken by the parties were reasonably necessary at the time they were taken. The district court also noted that it was unclear whether the depositions were taken for discovery purposes or trial preparation. We have never required a prevailing party to demonstrate that a particular deposition was reasonably necessary at the time it was taken for a party to recover the costs of the deposition transcript. Again, the pertinent question is whether the transcript was necessarily obtained for use in the case. It appears undisputed that the majority of these depositions were taken at Marmillion's behest, were designated by Marmillion for use during trial, and were actually used at trial or in support of the parties' pretrial motions. The defendants had a reasonable expectation that at least some of the transcripts would be used for trial preparation. The district court's denial of all deposition costs was an abuse of discretion. We vacate the district court's denial of costs for printed and electronically recorded transcripts and remand for further consideration under the appropriate standard.

B.

The defendants also argue that the district court abused its discretion in denying the costs for daily trial transcripts. The district court found that real time reporting and daily transcripts were not necessary because 1) there were other attorneys at trial who could have taken notes and 2) the trial was not so complicated as to necessitate the use of real time reporting and daily transcripts. The court specifically found that daily transcripts and real time reporting were merely a convenience to the parties.

In Studiengesellschaft Kohle mbH v. Eastman Kodak Co., this court held that "[t]o award the cost of daily transcripts, the court must find that they were not obtained primarily for the convenience of the parties but were necessarily obtained for use in this case." 713 F.2d 128, 133 (5th Cir. 1983) (quotations and citation omitted). "Necessity" is a factual finding. Id. To demonstrate that the district court's finding on the issue of necessity was clearly erroneous, the defendants point to the following evidence: 1) Marmillion agreed to split the cost of the daily transcripts; 2) the defendants used the transcripts to argue their motions for directed verdict; and 3) the defendants submitted portions of the transcripts to the district court to rebut Marmillion's assertions that she had created an issue of fact. Although the above evidence would support a finding by the district court that the transcripts were necessarily obtained for use in this case, the evidence does not compel such a finding. Further, the cited evidence does not dispel the district court's finding that the transcripts were obtained primarily for the convenience of the parties. We affirm the district court's denial of daily transcript costs.

C.

The defendants also appeal the district court's partial denial of copying costs. Before the district court, the AIG defendants sought $1,014.42 for copies of documents that were obtained for use in the case. Finding that the AIG

16

defendants did not provide any explanation concerning $599.02 worth of copies, other than noting that they were "photocopies for trial," the district court limited the AIG defendants' award of copying costs to $415.40.

On appeal, the AIG defendants argue that the facts clearly show that the AIG defendants provided a thorough explanation of their copying expenses. In response to Marmillion's objections, the AIG defendants, in an attachment, listed the number of pages copied, the cost of each copy, and the purpose of each copy. For instance, on November 3, 2008, the AIG defendants spent $6.80 to copy 68 pages to make a copy of the AIG trial exhibits for the court and a copy to be used by AIG at trial. It seems reasonably clear that the district court did not consider the exhibit submitted by AIG detailing the copying costs. Accordingly, we vacate the partial denial of copying costs and instruct the district court to consider the AIG defendants' exhibit detailing their copying costs when assessing whether the costs were necessarily obtained for use in the case.

The Willis defendants also complain of the partial denial of their copying costs. The district court granted the Willis defendants $485.10 of the $1,776.50 they requested. As to the denied costs, the district court found

> [t]he other copying costs claimed by Willis appear to concern the copying of videos (presumably video depositions), the scanning of documents produced in discovery, the copying of every pleading filed in the case, and the placement of barcodes on exhibits so that certain technology could be used in order to publish exhibits to the jury. The Court finds that these remaining "copying" expenses are not recoverable, since Willis has not demonstrated that these expenses were necessary for trial preparation rather than the convenience of its attorneys.

To support their position that the district court abused its discretion by not allowing the Willis defendants to recover the full amount of their copying costs, the Willis defendants merely state that they "made electronic copies of all exhibits and video depositions for use at trial and used numerous electronic

17

copies of exhibits at trial to question witnesses and publish those exhibits to the jury at the same time" and the use of the electronic copies was not merely for the convenience of counsel. The Willis defendants' argument is insufficient to establish that the district court abused its discretion. Accordingly, we affirm the district court's partial denial of Willis's copying costs.

D.

The AIG defendants also sought $158.18 in subpoena costs they incurred for service of a deposition subpoena on a witness. The district court found that the AIG defendants had not demonstrated that the subpoena costs were recoverable as a necessary expense in trial preparation.

The AIG defendants cite a Fifth Circuit opinion for the proposition that private service of process fees are recoverable under Section 1920. Gaddis v. United States, 381 F.3d 444, 456 (5th Cir. 2004). In Gaddis, this court noted that the Ninth Circuit had interpreted "[f]ees of the clerk and marshal" in Section 1920 to include the fees of private process servers to support this court's holding that the court may interpret the meaning of Section 1920. Id. This court did not, however, adopt the Ninth Circuit's interpretation. Id.

In Cypress-Fairbanks Independent School District v. Michael, this court held that absent exceptional circumstances, the costs of a private process server are not recoverable under Section 1920. 118 F.3d 245, 257 (5th Cir. 1997). Because the AIG defendants did not argue and have not demonstrated that exceptional circumstances exist to warrant such an award, we affirm the district court's denial of the private process server fees.

IV.

For these reasons, we affirm the district court's judgment as matter of law against Marmillion. We, however, vacate the district court's awards of costs and remand for further consideration consistent with this opinion.